UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OUTFRONT MEDIA, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>THE CITY OF SAN DIEGO, et al.,<br><br>                    Defendants. | Case No.: 19cv2236 JM(BGS)<br><br>**ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

Presently before the court are Outfront Media, LLC's ("Outfront") Motion for Partial Summary Judgment (Doc. No. 30) and Defendants' Cross Motions for Summary Judgment or in the Alternative, Summary Adjudication of Issues (Doc. Nos. 31, 32, 33). The motions have been fully briefed and the court finds them suitable for determination on the papers submitted and without oral argument in accordance with Civil Local Rule 7.1(d)(1). For the reasons set forth below, Outfront's motion is **denied**, and Defendants' motions are **granted-in-part**.

## I.    BACKGROUND

### A. Undisputed Facts

The dispute concerns whether a billboard previously located at 1473 F Street, San Diego, California, was inversely condemned because the property on which it was located was purchased as part of a redevelopment plan to build the East Village Green Park.

In 1957, Outfront's predecessor in interest began a five-year lease for a portion of 1473 F Street for the purpose of constructing and maintaining a billboard. (Doc. No. 30-2, Declaration of Katie Metz, ¶ 4.) The original lease allowed for renewal for additional five-year terms, unless otherwise terminated. (*Id.*) In 1967, Outfront's predecessor in interest entered into a new ten-year lease, with additional one-year terms to follow, unless otherwise terminated. (*Id.*) Subsequently, in 1980 and 1983, the lease regarding the billboard was renegotiated. (*Id.*)

The lease governing this dispute dates back to 1985 and was between Gannett Outdoor Co., Inc.[1] and the property owner. (Doc. No. 30-2 at 6[2]; Doc. No. 36-3). The lease was for a five-year term at $900 a year, with the rent increasing to $1,200 per year after eighteen months. (*Id.*) The lease would renew for:

> subsequent successive terms unless terminated at the end of such term or any successive term upon written notice by the Lessor or Lessee served by certified or registered mail thirty (30) days before the end of such term or subsequent like term, provided that Lessee shall have the right to terminate the Lease at the end of any monthly period upon written notice to Lessor served not less than thirty (30) days prior to the end of such monthly period. Lessor shall have the right to terminate the Lease at any time during the period of this Lease if the Lessor is to improve the unimproved property by erecting thereon a permanent private commercial or residential building. Lessee shall remove its signs within thirty (30) days after receipt of a copy of the applicable building permits, but only if in addition it has been paid in full at the time notice of building is given the consideration described in the sentence which follows immediately. The Lessor will upon giving such notice of building, return to the Lessee all rent paid for the unexpired term…. If any portions of the property are not to be utilized for such building, the Lessee has the option to use the remaining portion on the same terms, except that the rent shall be proportionally reduced.

---

[1] Gannett Outdoor is one of the previous name iterations Outfront has used. (*See, e.g.,* Doc. No. 36-4 at 9-10.) Outfront was also previously known as Viacom and CBS Outdoor. (*Id.* at 10.)

[2] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

*Id.* at ¶ 4. The lease provides that it is binding upon the heirs, assigns and successors of both the lessor and lessee. (*Id.* at ¶ 9.)

On October 18, 2005, Viacom Outdoor signed an addendum to the lease (# 80531) which provides:

> As of November 16, 2005, this lease shall automatically renew for month to month like terms. The Lessor shall have the right to terminate this Lease at any time during the term. Tenant shall have thirty days from the day notice was given to remove said structure.
>
> In addition … rent shall be Two thousand four hundred dollars ($2,400) per year…
>
> All other terms of this Lease shall remain the same.
>
> The parties further agree that this Addendum shall supersede any contrary or conflicting provisions of the Lease.

Doc. No. 30-2 at 8; Doc. No. 31-7 at 2; Doc. No. 33-4 at 7; Doc. No. 36-6 at 2.

Title to 1473 F Street transferred several times throughout the years. The contractual relationship on the 1985 lease was between Garnett Outdoor Co., Inc., and Kim M. Wilson, an individual. (Doc. No. 30-2 at 6; Doc. No. 36-4 at 12). However, the Addendum was signed by Jerome's Furniture Warehouse/Navarra Properties and Viacom Outdoor (Doc. No. 30-2 at 8; Doc. No. 33-4 at 61; Doc. No. 36-4 at 19; Doc. No. 36-5).

On February 1, 2010, the Center City Development Corporation ("CCDC"), on behalf of the Redevelopment Agency of the City of San Diego ("Agency"), sent a letter to Navarra Properties proposing the acquisition of 1473 F Street for a public project. (Doc. No. 30-3 at 41-68; Doc. No. 31-8 at 2-18; Doc. No. 33-5 at 167-194.) The letter discloses that the offer to purchase was a conditional one needing approval of the Agency, and that "while CCDC staff proposes to recommend the acquisition of the [Property] to the Agency for this project, no decision to acquire can be made until the Agency formally acts to approve this acquisition." (*Id.* at 41; 2; 167.) The letter also informs that 1473 F Street is located within the project area proposed for future use as East Village public park. (*Id.*)

3

Included with the letter were four disclosures: (1) California Government Code 7267.2(a) – Offer to Purchase; (2) Statement and Summary of the Basis for Just Compensation; (3) Summary Statement Accompanying Government Code 7267.2(a); and (4) Contract of Acquisition. (Doc. No. 30-1 at 45-68; Doc. No. 31-8 at 7-13; Doc. No. 33-5 at 171-194.)

That same day, the CCDC sent a letter to CBS Outdoor on behalf of the Agency, informing CBS Outdoor that it was proposing the Agency acquire 1473 F Street for proposed future use as East Village public park. (Doc. No. 30-3 at 70-81; Doc. No. 33-5 at 154-165; Doc. No. 36-7 at 2-17.) The letter stated that although CBS Outdoor was not the property owner, it may have an interest in 1473 F Street as a tenant/business operator and was being provided with information regarding the proposed acquisition because of "the improvements pertaining to realty – the billboard" located on the property. (*Id*. at 70; 154; 2.) The purpose of the letter was to convey the Agency's offer to purchase the billboard for $12,160 so that the "Agency may initiate negotiations regarding the proposed acquisition of the Parcel." (*Id*. at 71, 76; 155, 161; 3, 8.) The letter included the following disclosure:

> [w]hile CCDC staff proposes to recommend the acquisition of the [Property] to the Agency for this project, no decision to acquire can be made until the Agency formally acts to approve this acquisition. Nothing in this letter is meant to pre-commit the Agency or otherwise limit the options available to the Agency. Consequently this offer, if accepted, and the acquisition of the [Property] is conditional upon and requires the approval of the Agency.

(*Id*. at 70; 154; 2.) Included with the letter were four disclosures: (1) Parcel Legal Description; (2) Statement and Summary of the Basis for Just Compensation; (3) Attachment Relating to Appraisal of Improvements Pertaining to the Realty; and (4) Summary Statement Accompanying Government Code 7267.2(a). (Doc. No. 30-3 at 73- 81; Doc. No. 36-7 at 5-13.)

On April 22, 2010, Daley & Heft, LLP sent a letter to CBS Outdoor on behalf of the CCDC following up on the February 1, 2010 offer to acquire the billboard located at 1473 F Street. (Doc. No. 33-5 at 196-197.) On April 28, 2010, Daley & Heft, LLP sent a follow

up letter to CBS Outdoor to confirm that "[t]his morning you advised that CBS Outdoor is rejecting the offer made by CCDC in the amount of Twelve Thousand One Hundred Sixty Dollars ($12,160). I will advise CCDC of CBS's position, as well as your proposal to settle, which, if I understand it correctly, CBS is willing to relocate the billboard if the City of San Diego provides a permit to relocate said structure." (*Id.* at 199-200.)

On August 23, 2010, Navarra Properties AJ2, L.P., and the Agency entered into an agreement to sell 1473 F Street for $2,449,882. (Doc. Nos. 30-3 at 88-109; Doc. No. 33-5 at 213-223; Doc. No. 34-7 at 2-13; Doc. No. 35-7 at 2-13; Doc. No. 37-16 at 2-28; Doc. No. 38-8 at 2-13.) A paragraph in the agreement contains the following sentence: "Buyer and Seller acknowledge that the sale of the Property is under the threat of eminent domain." (*Id.* at ¶ 16.)

The sale of 1473 F Street occurred, and the grant deed was duly registered with the San Diego Recorder's Office. (Doc. No. 30-3 at 111; Doc. No. 31-9 at 2-4; Doc No. 33-5 at 202-04; Doc. No. 36-8 at 2-4; Doc. No. 37-14 at 2-4.) Upon the sale of 1473 F Street, Navarra Properties and the Agency entered into a one-year leaseback agreement, with Navarra now being the tenant of 1473 F Street. (Doc. No. 30-3 at 98-109; Doc. No. 33-5 at 226-239; Doc. No. 34-7 at 14-28; Doc. No. 35-7 at 14-28; Doc. No. 38-8 at 14-28).

Following the purchase of the property, the Agency was dissolved as of February 1, 2012. (Doc. No. 30-3 at 11-12; Doc. No. 31-11 at 4; Doc. No. 31-11 at 2.) On January 12, 2012, as a result of the passage of California State assembly bill AB 26, the San Diego City Council passed a resolution designating the City of San Diego as the successor agency to the Agency and electing to retain the Agency's housing assets and assume the Agency's housing responsibilities. (Doc. No. 31-10 at 2-5; Doc. No. 33-5 at 12-15; Doc. No. 36-9 at 2-5; Doc. No. 37-8 at 2-5.)

On June 27, 2012, Civic San Diego ("Civic") filed restated articles of reincorporation. (Doc. No. 33-5, 8-10; Doc. No. 37-7 at 2-4). The articles provide that the nonprofit corporation was formerly known as CCDC. (*Id.* at 8; 2.) According to Article II C, one of the non-profit's purposes is to: "(i) engage in economic development, land use

permitting and project management services which under California law can be done by contract with or delegated by the City of San Diego ("City"), or the City solely in its capacity as the designated successor agency to the Redevelopment Agency to the City of San Diego ("Successor Agency")." (*Id*.)

On June 28, 2012, the San Diego City Council passed a resolution approving the newly reorganized CCDC and its name change to Civic. (Doc. No. 31-11 at 2-11; Doc. No. 33-5 at 62-65; Doc. No. 37-10 at 2-5.) That same day, the City Council passed a resolution authorizing the execution of a four-year agreement for consulting services between City as successor agency and Civic for housing successor agency services. (Doc. No. 33-5 at 105-107; Doc. No. 37-12 at 2-4.) Specifically, the resolution stated: "the Mayor had determined [that] in order to wind down the [Agency]'s operations in an orderly manner, the City will require the unique professional services and particular professional expertise of Civic San Diego, a California nonprofit public benefit corporation, formerly known as Center City Development Corporation, Inc." (*Id*. at 107; 3.) The consulting agreement was duly executed. (Doc. No. 33-5 at 67-103.)

On January 15, 2013, Civic sent notice to CBS Outdoor, providing it with thirty (30)-days to remove its billboard from 1473 F Street. (Doc. No. 35-4 at 2; Doc. No. 38-5 at 2.) The letter informs CBS Outdoor that 1473 F Street is now owned by the Agency's Successor Agency and that it, Civic, manages the lease. Further, the notice states: "the lease allowing your firm to use the 1473 F Street property for your billboard has expired and will not be renewed and that you have thirty days to completely remove your billboard structure and any ancillary material from this property." *Id*.

On September 7, 2016, four-years after the dissolution of the Agency, City, "solely in its capacity as the designated successor agency to the Redevelopment Agency of the City of San Diego, a former public corporate and politic ("Grantor")" granted to "the City of San Diego, a California municipal corporation," the 1473 F Street property. (Doc. No. 30-3 at 115-120; Doc. No 31-12 at 2-7; Doc. No. 33-5 at 206-211; Doc. No. 36-11 at 2-7; Doc. No. 37-15 at 2-7.)

In December 2016, San Diego City Council passed a new resolution authorizing execution of five-year operating agreement between City and Civic. (Doc. No. 33-5 at 147-150). A new operating agreement was duly signed in March 2017. (Doc No. 33-5 at 109-152; Doc. No. 37-13 at 2-45.)

On May 21, 2018, Outfront sent a letter to City in response to City's May 2, 2018, letter. (Doc. No. 34-8 at 2-6; Doc. No. 35-8 at 2-6.) According to Outfront's letter, Civic, acting on behalf of City, had demanded the immediate removal of the billboard. (*Id*. at 2.) It states: "Civic has taken the position that the Successor Agency may terminate Outfront's Lease No. 80531 (the "Lease") as the successor-in-interest to the prior Property owner, and thus without having to compensate Outfront under California's eminent domain laws. We disagree." (*Id*.) Outfront's letter also mentions a January 15th notice of termination and claims that because the Agency could have taken the Property by eminent domain, the January notice "amounts to the 'substantial equivalent of a condemnation action." (*Id*. at 4.)

On April 17, 2019, City sent CBS Outdoor/Outfront notice for the purpose of terminating its tenancy of the billboard structure on the property located at 1473 F Street. (Doc. No. 31-13 at 2-4; Doc. No. 33-4 at 9; Doc. No. 36-12 at 2-4; Doc. No. 37-3 at 2.) The Notice explained:

> [t]he Addendum to Lease No. 80531, dated October 19, 2005, (Lease) currently allows for the renewal of the Lease from month to month, however the City of San Diego (City), as Lessor, has the right to terminate the Lease at any time during this month to month term. As required by the Lease, CBS Outdoor must remove its structure within thirty (30) days after service of this Notice upon you and you are required to quit and surrender possession of the Premises to the City no later than thirty (30) days after service of this Notice upon you. This Notice of Termination is served upon you for the City to begin construction of East Village Green Park on the Premises.

(Doc. No. 31-13 at 2; Doc. No. 33-4 at 9: Doc. No. 36-12 at 2; Doc. No. 37-3 at 2.) Along with the notice, City remitted Outfront's checks totaling $400 for March and April's rent. (*Id*.)

On May 16, 2019, City sent Outfront a letter announcing City was moving forward with its right to possess the 1473 F Street property effective midnight on May 17, 2019. (Doc. No. 30-3 at 122-123; Doc. No. 33-4 at 11-12; Doc. No. 37-4 at 2-3) The letter noted that "[a]ny issues surrounding eminent domain or relocation benefits should be the subject of civil litigation commenced after Outfront Media surrenders possession of the premises to the City." (*Id.* at 122; 11; 2.)

The billboard was removed by May 28, 2019.

## B. Procedural History

On November 22, 2019, Outfront filed suit against City and Civic alleging: (1) inverse condemnation in violation of the Fifth Amendment of the United States Constitution; (2) Defendants' acts, omissions, and conduct violated Plaintiff's rights and interests to the billboard without due process of law under the Fifth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. section 1983; (3) violation of California Business and Professions Code section 5412; (4) breach of contract; (5) intentional interference with prospective economic advantage; (6) negligent interference with prospective economic advantage; (7) unfair practices in violation of California Business and Professions Code section 17200, *et seq*; and (8) declaratory relief. (Doc. No. 1.) Outfront brought suit in federal court pursuant to 28 U.S.C. § 1331, asserting this court has original jurisdiction because its "claims arise under federal law in that a substantial, disputed question of federal law and is [sic] necessary element of Plaintiffs [sic] claims ..." (*Id.* at ¶ 3.) It sought relief for the state law claims pursuant to the court's supplemental jurisdiction, per 28 U.S.C. § 1367(a). (*Id.* ¶ 4.)

On February 16, 2021, the parties filed cross motions for summary judgment. (Doc. Nos. 30, 31, 32, 33.[3]) Plaintiff seeks partial summary judgment on its inverse

---

[3] Civic filed two motions for summary judgment (Doc. Nos. 32, 33.) The court performed a cursory review of the motions and unsuccessfully attempted to contact counsel to determine which of the two motions it should use. For purposes of this order, the court

condemnation and due process claims. (Doc. No. 30). City seeks summary judgment on all claims. (Doc. No. 36.) Civic, in turn, also seeks summary judgment on all claims. (Doc. No. 33.)[4] The parties timely filed their responses in opposition, (Doc. Nos. 34, 35, 36, 37[5]) and replies (Doc. Nos. 38, 39, 40).

## II.    LEGAL STANDARDS

A motion for summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show "that there is no genuine issue as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Entry of summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Id. at* 323 (1986).

If a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense. *See Nissan Fire & Marine Ins. Co., Ltd.*

---

will use the later filed motion, (Doc. No. 33). Accordingly, Civic's duplicative motion for summary judgment, entered on the docket at CM/ECF Doc. No. 32 is **DENIED** as **MOOT**.

[4] Along with its motion, Civic filed a request for judicial notice of several exhibits attached to its motion. (Doc. No. 33-3). Plaintiff has not objected to the request and finding the documents the type of which the accuracy cannot reasonably be questioned, the court takes judicial notice of Exhibits 1-13, attached to the declaration of Eli Sanchez, pursuant to Federal Rule of Evidence 201.

[5] Along with its response in opposition, Civic filed a request for judicial notice of several exhibits attached to its opposition. (Doc. No. 37-17). Plaintiff has not objected to the request and finding the documents the type of which the accuracy cannot reasonably be questioned, the court takes judicial notice of Exhibits 1-7, 12, 13 attached to the declaration of Eli Sanchez, pursuant to Federal Rule of Evidence 201.

*v. Fritz Cos, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990); *Cline v. Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 1991). Rule 56(e) requires "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. In other words, the nonmoving party cannot "rest upon mere allegations or denials of his pleadings." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (the non-moving party may not rely solely on conclusory allegations unsupported by factual data).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson*, 477 U.S. at 247 – 248. "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The inquiry is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251 – 252. The court must examine the evidence in the light most favorable to the nonmoving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), and any doubt as to the existence of an issue of material fact requires denial of the motion, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"When parties submit cross-motions for summary judgment, '[e]ach motion must be considered its own merits." *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotations and citations omitted). The court must review the evidence submitted in support of each cross-motion and determine whether disputed issues of material fact are present, even if both parties assert that there are no uncontested issues of material fact. *Id; see also United States v. Fred A. Arnold, Inc.*, 573 F.2d 605, 606 (9th Cir. 2000). If, however, the cross-motions are before the court at

10

the same time, the court is obliged to consider the evidence proffered by both sets of motions before ruling on either one. *Fair Housing Council of Riverside Cnty., Inc.*, 249 F.3d at 1134.

## III. DISCUSSION

Since the cross motions for summary judgment request adjudication of the same issues and contain arguments common to all, the court will address the motions together.

### A. Inverse Condemnation

Outfront argues that a grant of summary judgment is warranted on the inverse condemnation claim because the facts demonstrate that Defendants effectuated a regulatory taking of its property, the billboard, for which they must pay just compensation under the Fifth and Fourteenth Amendment of the United States Constitution. (Doc. No. 30; *see also* Doc. Nos 34, 35.) City, in contrast, maintains that summary judgment in its favor is appropriate because it never threatened or manifested an intention to exercise eminent domain over Outfront's property, and that the lease was terminated properly. (Doc. No. 31; *see also* Doc. No. 36.) Further, City argues, that it cannot be held liable for the actions taken by a separate and independent former legal entity over ten years ago. And, Civic contends that the eminent domain and due process claims against it fail because it is not a government entity, and it does not have the power of eminent domain. (Doc. No. 33; *see also* Doc. No. 37.)

"Inverse condemnation is 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant.'" *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2168 (2019) (quoting *United States v. Clarke*, 445 U.S. 253, 257, (1980) (quoting D. Hagman, Urban Planning and Land Development Control Law 328 (1971))). In *Chicago, Burlington & Quincy Railroad Co. v. City of Chicago,* 166 U.S. 226 (1897), the Supreme Court made the Fifth Amendment's prohibition against uncompensated takings applicable to the states through the Fourteenth Amendment's due process clause. The Court held that state compensation for government takings must comport with due process of law. *Id.* Recently,

the Supreme Court clarified that a property owner has an actionable Fifth Amendment takings claim when the government takes his/her property without just compensation and may bring his/her claim in federal court under § 1983 as soon as the property is taken and no longer has to exhaust the state-litigation requirement. *Knick,* 139 S. Ct. at 2167-68, 2170-73.[6]

"Municipalities possessing delegated eminent domain power also are subject to the restrictions of the Fifth and Fourteenth Amendments." *Richardson v. City & Cnty. of Honolulu*, 124 F.3d 1150, 1156 (9th Cir. 1997) (citing *Chi. B. & Q.R.R. Co. v. City of Chi.*, 166 U.S. 226, 238-39 (1896)). The applicable provision of the California Constitution provides, in relevant part, that "[p]rivate property may be taken or damaged for public use only when just compensation … has first been paid to, …, or for, the owner." Art. 1 § 19, CAL. Constitution. "Although the California Constitutional takings clause at art. 1., § 19, protects a somewhat broader range of property values than does the same corresponding federal provision, California courts have construed the clauses congruently and applied federal law in analyzing state law claims." *Daniel and Francine Scinto Found. v. City of Orange*, Case No.: SA CV 15-1537-DOC (JCGx), 2016 WL 4150453, at * 4 (C.D. Cal. Aug 3, 2016) (internal quotation marks and citations omitted).

To establish its claim for inverse condemnation against Civic and City, Outfront must show (1) it has an interest in real or personal property, (2) the government substantially participated in planning, approval, construction or operation of the public project or public improvement, (3) plaintiff's property suffered damage, and (4) the government's project, act, or omission was a substantial cause of the damage. *See*

---

[6] This is because "once there is a 'taking,' compensation *must* be awarded" because "[a]s soon as private property has been taken, whether through formal condemnation proceedings, occupancy, physical invasion, or regulation, the landowner has *already* suffered a constitutional violation." *Id*. at 2172 (quoting *San Diego Gas & Elec. Co. v. San Diego*, 450 U.S. 621, 654, (1981) (Brennan, J., dissenting)).

*Yamagiwa v. City of Half Moon Bay,* 423 F. Supp. 2d 1036, 1088 (N.D. Cal. 2007). California Code of Civil Procedure section 1263.205 provides that an owner of any "improvements pertaining to the realty" on property taken by eminent domain, "that cannot be removed without a substantial economic loss," is entitled to compensation for the value of the improvements. Further, the code provides that the "owner of a business conducted on the property taken [] shall be compensated for loss of goodwill, if … the loss is caused by the taking of the property." Cal. Civ. Proc. Code § 1263.510. The same eminent domain statutory rules apply to suits in inverse condemnation. *See Chhour v. Cmty. Redevelopment Agency,* 46 Cal. App. 4th 273, 280 (1996).

### 1. The Sale of the 1473 F Street property

Because Outfront has attempted to connect the 2019 lease termination with the 2010 sale of the property on which the billboard is located, (Doc. No. 30-1 at 4-6; *see also* Doc. No. 38 at 6-9), the court begins its analysis by looking at the sale of the 1473 F Street property.

On February 1, 2010, the CCDC sent a letter to Navarra Properties proposing the sale of 1473 F Street, which is the property on which the billboard is located, for a public project. (Doc. No. 30-2 at 41-68; Doc. No. 31-8 at 2-13). On the same date, the CCDC sent CBS Outdoor an offer to purchase the billboard so that the Agency could initiate negotiations regarding the proposed acquisition of 1473 F Street for future use as East Village public park. (Doc. No. 30-3 at 70-81; Doc. No. 36-7.) CBS Outdoor declined the offer to purchase the billboard. (Doc. No, 33-5 at 196.) Thereafter, the Agency purchased 1473 F Street from Navarra Properties. (Doc. No. 30-3 at 88-109; Doc. No. 31-8 at 2-4; Doc. No. 33-5 at 213-223; Doc. Nos. 34-7 at 2-13; Doc. No. 35-7 at 2-13; Doc. No. 38-8 at 2-13.)

While it is undisputed that the Agency had the power of eminent domain, the parties dispute whether the Agency exercised eminent domain in purchasing 1473 F Street. Admittedly, the agreement for the purchase of 1473 F Street contains the language: "Buyer and Seller acknowledge that the sale of the Property is under the threat of eminent domain."

(Doc. No. 30-3 at 88-109 ¶ 16; Doc. No. 33-5 at 213-223, ¶ 16; Doc. No. 34-7 at 2-13, ¶ 16; Doc. No. 35-7 at 2-13, ¶ 16; Doc. No. 37-16 at 2-28, ¶ 16; Doc. No. 38-8 at 2-13, ¶ 16.)  The letters to CBS Outdoor and Navarra Properties also include a paragraph stating: "California Government Code section 7267.1 provides that a public entity shall make every reasonable effort to acquire expeditiously real property by negotiation rather than by litigation in the form of an eminent domain action.  Please consider this offer as being made in the spirit of avoiding litigation, and not as an admission of value." (Doc. No. 30-3 at 43; Doc. No. 31-8 at 4; Doc. No. 30-3 at 72; Doc. No. 36-7.)  Although 1473 F Street was sold so it could later be used for the public purpose of developing the East Village public park the evidence does not suggest a taking occurred.  The acquisition of 1473 F Street consisted of  an open market transaction *(see Langer v. Redevelopment Agency of City of Santa Cruz*, 71 Cal. App. 4th 998, 1004 (1999) (collecting cases)) in which the offer included a summary of sales of similar properties that were recently sold that was used to value the property, (*see* Doc. No. 33-5 at 181-185).  Assuming, however, the property was acquired by threat of eminent domain directed at Navarra Properties, the same cannot be said for Outfront's leasehold interest, as set forth below.

## 2.  Removal of the billboard

Outfront contends that City's demand that the billboard be removed was the substantial equivalent to a "taking" in the parlance of eminent domain law.   It maintains that it is entitled to any lost goodwill and/or other damage flowing from the termination of its leasehold interest in, and the removal of the billboard from 1473 F Street.   At the threshold, two unassailable propositions need to be recognized.   First, simply stated, Outfront did not, (and does not), stand in the shoes of Navarra Properties, the owner of the property being acquired, Outfront's interest was a leasehold, limited by contract, and terminable virtually at any time upon timely notice from the City.   Second, Outfront suffered "no damage," the third necessary element for an inverse condemnation claim; rather only the natural and unavoidable contractual consequence of agreeing to a month-to-month lease.   Moreover, nothing in the record suggests CBS Outdoor itself was ever

threatened with eminent domain by the Agency. The February 1, 2010, letter from the CCDC simply conveys its intent to recommend that the Agency offer to purchase the billboard as part of its proposed acquisition of 1473 F Street, (*see* Doc. No. 30-3 at 70-81; Doc. No. 36-7 at 2-13). The fact that the parties attempted to negotiate the relocation of the billboard after CBS Outdoor rejected the initial offer of $12,160, (*see* Doc. No. 33-5 at 196-97) does not change this conclusion. Similarly, City's decision to allow Outfront to continue with its leasehold for almost nine years after the Agency acquired 1473 F Street does not alter the analysis. And, notwithstanding the fact that City has the power of eminent domain, City never exercised its power of eminent domain or threatened its use regarding the billboard's lease, and no substantiated facts have been produced to suggest otherwise. To the contrary, during her 30(b)(6) deposition, Outfront's Katie Metz, stated that as far as she was aware, City has never told Outfront that it would use the power of eminent domain to obtain the billboard, (Doc. No. 31-3 at 26; Doc No. 36-4 at 26; *see also id.* at 26-27 (confirming second letter sent by City makes no reference to attempting or wanting to use the power of eminent domain to take the billboard)). In sum, what is absent here is an unequivocal act or intent to condemn from City which would convert the termination of the month-to-month lease into the substantial equivalent of City exercising its eminent domain power to condemn the billboard. *See Pacific Outdoor Adver. Co. v. City of Burbank*, 86 Cal. App. 3d 5, 11 (1978) (for termination of a lease to be the substantial equivalent of exercising eminent domain there needs to be "a definite and unequivocal manifestation that the public entity in question was ready to use its power to condemn, and in fact would clearly do so if necessary to acquire the property at issue."). The mere fact that City has the power of eminent domain, when in fact such power is neither exercised nor remotely threatened, is insufficient to render it liable in an inverse condemnation action. *See id.* at 12.

Furthermore, the caselaw in this area demonstrates that the contract controls. Where "[t]he rights and duties of the parties spring from the lease [,] [s]o, too, liabilities arising from breach of the lease are creatures of the agreement. There is no reason to impose

extractcontractual liability for breach, simply because the breaching party is a governmental entity." *Cnty. of Ventura v. Channel Islands Marina, Inc*. 159 Cal. App. 4th 615, 624 (2008). Federal courts have also not recognized takings claims where the taken property arose from a contract or lease. *See, e.g., Detroit Edison Co. v. United States,* 56 Fed. Cl. 299, 302 (Fed. Cir. 2003) **(**the concept of a taking as a compensable claim has limited application "when 'the relative rights of party litigants ... have been voluntarily created by contract. In such instances interference with such contractual rights generally gives rise to a breach claim not a taking[s] claim.'" (quoting *Hughes Commc'ns Galaxy, Inc. v. United States,* 271 F.3d 1060, 1070 (Fed.Cir.2001)); *Marathon Oil Co. v. United States,* 16 Cl. Ct. 332, 339 (Cl. Ct. 1989) ("the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. [citation omitted]. In such instances interference with such contractual rights generally gives rise to a breach claim not a taking claim.").

Here, once the sale of 1473 F Street was recorded, the Agency and CBS Outdoor did not negotiate a new lease; rather, the old lease and addendum transferred to the Agency. Inasmuch as the Agency, at the time of purchase was not ready to develop the East Village Park, it appears it was willing to allow CBS Outdoor to continue to pay rent and maintain the billboard at 1473 F Street. Between August 2010 – January 2013 the record illustrates that CBS Outdoor continued its lease until it received notice from Civic that the lease would be terminated. (Doc. No. 35-4 at 2; Doc. No. 38-5 at 2; Doc. No. 38-6 at 2.) For reasons not known to the court, the lease was not terminated in February 2013, rather it was extended until City sent a notice of termination on May 8, 2018. (Doc. No. 34-8 at 2-6; Doc. No. 35-8 at 2-6.) Again, City chose to change course and the parties reverted to a month-to-month lease.

The 2005 Addendum to the lease, which created a month-to-month leasehold, with a thirty-day notice requirement, continued to control the parties' contractual arrangement. (*See* Doc. No. 30-2 at 8; Doc. No. 31-7 at 2; Doc. No. 33-4 at 7; Doc. No. 36-6 at 2.) As required by the Addendum, on April 17, 2019, City sent CBS Outdoor/Outfront notice that

16

it was terminating its tenancy of the billboard structure. The notice provided the required 30-day notice and explains, that although the lease allows for renewal, it was being terminated so City could "begin construction of East Village Green Park on the Premises." (Doc. No. 31-13 at 2; Doc. No. 33-4 at 9: Doc. No. 36-12 at 2; Doc. No. 37-3 at 2.) City sent a follow up letter on May 16, 2019 confirming its intention to terminate the lease at the end of the 30-day termination period. (Doc. No. 30-3 at 122-123; Doc. No. 33-4 at 11-12; Doc. No. 37-4 at 2-3.) City duly provided Outfront access to 1473 F Street so that it could retrieve the billboard. Outfront entered the property and removed the billboard in May 2019.

In sum, the court finds no reasonable trier of fact could reasonably infer City's actions regarding the removal of the billboard from the 1473 F Street property related to or was a function of its eminent domain power. Rather, the court views City's power to condemn simply as coincidental to the valid termination of a month-to-month lease. Put another way, Outfront falls leagues short of creating a triable issue of material fact on the third element of an inverse condemnation claim, i.e., "damages" due to governmental planning or property acquisition for a public project.

### 3. Eminent Domain Liability

For the sake of completeness, and because the parties have dedicated pages of their briefs to the issue, the court turns the question of whether either City or Civic could be held liable for a claim of eminent domain.

On January 12, 2012, City was designated as the Agency's successor agency. (Doc. No. 31-11 at 4; Doc. No. 31-11 at 2; Doc. No. 36-9 at 2-5; Doc. No. 37-8 at 2-5.) A subsequent resolution, passed by the city council on February 17, 2012, establishing certain policies and procedures for the operation of the successor agency includes the following provision:

> Whereas, at the time of Former A[gency]'s dissolution, the City, in its capacity as the successor agency to the Former [Agency] (Successor Agency), became vested with all of the Former A[gency]'s authority, rights, powers, duties, and obligations under the California Community Redevelopment Law

17

and, by operation of law, received all assets, properties, contracts, leases, books and records, buildings and equipment of the Former A[gency] for administration pursuant to the Dissolution Provisions

(Doc. No. 31-11 at 2-3; Doc. No. 31-11 at 2-3; Doc. No. 36-10 at 2-3.)  Further, the resolution provides that for purposes of filing lawsuits and claims: "the name of the Successor Agency shall be: 'City of San Diego, solely in its capacity as the designated successor agency to the Redevelopment Agency of the City of San Diego, a former public body, corporate and politic.'"  (*Id.* at 4, ¶ 1.)

The June 28, 2012 resolution approving CCDC's reorganization and name change to Civic notes that City is the sole member of CCDC/Civic.  (Doc. No. 33-5 at 62; Doc. No. 37-10 at 2.)  Further, it provides: "at the time of the Former A[gency]'s dissolution, the City, in its capacity as the successor agency to the Former A[gency] (Successor Agency), became vested with all of the Former A[gency]'s authority, rights, powers, duties, and obligations under the California Community Redevelopment Law…" (*Id.* at 63; 3.)

In June 2012, City and Civic entered into an agreement which allowed for Civic to provide services to City for Successor Agency and Housing Successor Agency Services.  (Doc. No. 33-5 at 67-103; Doc. No 37-11 at 2-38.)  Civic's role was defined as a consultant to provide services related to the winding down and/or completion of projects of the former Agency.  (*Id.* at  ¶ 1.1.)

Civic and City entered into a second operating agreement in December 2016.  (Doc. No. 33-5 at 109-152; Doc No. 37-13 at 2-45.)  The agreement provides for Civic to provide support to City as successor agency to the Agency.  (*Id.* at ¶ 2.1.2.)  Specifically, the pertinent section of provision 2.1.2 states: "Civic shall take all steps necessary and desirable by City to perform the functions required to implement the winding down of redevelopment and/or completion of projects of the [] Agency and to manage the assets of the Former Agency…." (*Id.*)

The documents described above and the submitted deposition testimony of Elias Sanchez, Civic's person most knowledgeable, (*see, e.g.*, Doc. No. 30-3 at 37-38; Doc. No.

34-3 at 17-19, 24-27, 32-33; Doc. No. 35-3 at 17-19, 24-27, 32-33; Doc No. 38-4 at 17-19, 24-27, 32-33) and City's designated individual, Brad Richter (see, e.g., Doc. No. 30-3 at 12-14; Doc. No. 34-6 at 14-15; Doc. No. 35-6 at 14-15; Doc. No 38-7 at 15) make clear that Civic, and its predecessor the CCDC, were simply acting as agents of both the Agency and City. Civic's role was that of a consultant, manager, or broker. (Doc. No. 30-3 at 12-14, Doc. No. 30-3 at 37-38.) When it communicated with Navarro Properties, Outfront, or any of Outfront's predecessors in interest, it was doing so in this capacity. Despite Outfront's protestations to the contrary (*see* Doc. No. 34 at 9-17, Doc. No. 38 at 3-6), Civic has never had the power of eminent domain, was not the purchaser of 1473 F Street, has not attempted to acquire the billboard and none of its actions can be viewed as constituting inverse condemnation. Looking back to 2010, Civic's predecessor, CCDC, did indeed propose the acquisition of the billboard, (*see* Doc. No. 30-3 at 70-81; Doc. No. 36-7 at 2-13), but it did so at the direction of the Agency, (*see id.*). Furthermore, Plaintiff made an error in misidentifying Civic as the Agency's successor agency in the complaint, (Doc. No. 1 ¶ 7). The record demonstrates that City was designated as the Agency's successor agency. (Doc. No. 31-11 at 4; Doc. No. 31-11 at 2; Doc. No. 36-9 at 2-5.) Consequently, any inverse condemnation claim against Civic cannot stand.

As to City's arguments that it has been misidentified in the complaint and cannot be sued as a municipality for any actions it took as the successor agency, none of these arguments control the outcome of the motions currently before the court.

### 4. Conclusion on Inversion Condemnation Claim

In accordance with the following, the court **denies** Plaintiff's motion for partial summary judgment on the inverse condemnation claim and **grants** City's and Civic's motions for summary judgment on the first cause of action.

### 5. Violations of Fifth and Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983

As set forth above, Outfront has not established that a taking occurred, therefore, there has been no violation of the Fifth or Fourteenth Amendments. Consequently, the

19

42 U.S.C § 1983 cause of action, brought on the basis of a violation of the Fifth Amendment prohibition against uncompensated takings also fails. *See Knick*, S. Ct. 2162, 2167-68. (property owner may bring a Fifth Amendment takings claim in federal court under § 1983 when the government takes property without just compensation). To the extent Outfront attempts to base its second cause of action on an alleged breach of contract claim, this fails because Outfront explicitly abandoned its breach of contract claim, (*see* Doc. No. 34 at 21; Doc No. 35 at 11). Accordingly, the court **denies** Plaintiff's motion for partial summary judgment on the 42 U.S.C. § 1983 due process claim and **grants** City's and Civic's motions for summary judgment on the second cause of action.

### B. Remaining State Law Claims

Federal courts have the discretion to exercise supplemental jurisdiction over all claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Even if supplemental jurisdiction exists, however, district courts may decline to exercise supplemental jurisdiction over a claim if: (1) it raises a novel or complex issue of state law; (2) it substantially predominates over the claim(s) over which the court has original jurisdiction; (3) the court has dismissed all claims over which it has original jurisdiction; or (4) there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). The Supreme Court has identified additional factors that district courts should consider when deciding whether to exercise supplemental jurisdiction, "including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims." *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997).

"While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by

the *Gibbs*[7] values 'of economy, convenience, fairness, and comity.'" *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (citations omitted). A district court need not "articulate why the circumstances of [the] case are exceptional" to dismiss state-law claims pursuant to 28 U.S.C. section 1367(c)(1)-(3). *San Pedro Hotel Co., Inc. v. City of L.A.*, 159 F.3d 470, 478–79 (9th Cir. 1998) (citation omitted).

Here, only two out of the nine claims are federal claims. As set forth above, the court has granted summary judgment in Defendants' favor on the only two claims over which it had original jurisdiction. The remaining claims involve questions of state law. Accordingly, the court **DECLINES SUPPLEMENTAL JURISDICTION** as to the remaining state law claims against Defendants. As a result, the court does not address the merits of the motions for summary judgment as to the third through ninth causes of action. Outfront may refile what remains of these claims in state court if it wishes, although the court notes that in its opposition to City's and Civic's motions for summary judgment, Outfront abandoned its claims against Civic for breach of contract and declaratory relief, *see* Doc. No. 34 at 21, and abandoned its claims against City for breach of contract and Business & Professions Code section 17200, *see* Doc. No. 35 at 11.

**IV.    CONCLUSION**.

For the foregoing reasons, City's and Civic's motions for summary judgment on the inverse condemnation and due process claims are **GRANTED**. Outfront's motion for partial summary judgement is **DENIED**. The Clerk of Court shall enter judgment for Defendants on claims one and two and **CLOSE** the case.

IT IS SO ORDERED.

Dated:  June 1, 2021

Hon. Jeffrey T. Miller
United States District Judge

---

[7] *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966).